UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


SHELLY K. CARPENTER,                                       CIVIL NO.  04-2617 (JRT/JSM)

     Plaintiff,

v.                                                                              REPORT AND RECOMMENDATION

JO ANNE BARNHART,
Commissioner of Social Security,

     Defendant.


The above matter is before the undersigned United States Magistrate Judge on Plaintiff's Motion for Summary Judgment [Docket No. 13] and Defendant's Motion for Summary Judgment [Docket No.  20].  This matter has been referred to this Court for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, the Court will recommend that Plaintiff's Motion for Summary Judgment be granted in part and denied in part, and that Defendant's Motion for Summary Judgment be denied.  It will be recommended that the decision of the Administrative Law Judge be vacated, and that the case be remanded for further administrative proceedings consistent with this Report and Recommendation.

## BACKGROUND

## I.  PROCEDURAL HISTORY

In 2001, plaintiff applied to the Social Security Administration, ("SSA"), for Social Security disability benefits.  (R. 66-72.)  She claims that she has been disabled since July 1, 2000, because of multiple physical and mental ailments, including (1) Sarcoidosis of the lungs, (2) a series of gastrointestinal afflictions that includes reflux esophagitis, "nutcracker esophagus," multiple hernia repairs, stomach pain and cramping, diarrhea, and

bowel incontinence, (3) degenerative disc disease, (4) severe headaches, (5) fibromyalgia, (6i) deep vein thrombosis in her legs, (7) chronic knee pain, and (8) depression.

Plaintiff's application for benefits was denied on February 22, 2002, because SSA found that she was not disabled under its rules and regulations. (R. 49-51.) Plaintiff filed a timely Request for Reconsideration, (R. 54), but the SSA's denial of benefits was re-affirmed on July 16, 2002. (R. 56-57.) Plaintiff then filed a timely request for a hearing before an Administrative Law Judge, ("ALJ"). (R. 59.) That hearing was held on March 19, 2003, before ALJ Harold Herseth. (R. 888-951.) Plaintiff was represented at the hearing by her present counsel, Mark G. Schneider. The ALJ heard testimony from plaintiff, and from a vocational expert, ("VE"), named James W. Berglie.

On September 2, 2003, the ALJ issued a decision denying plaintiff's application for benefits. (R. 15-32.) Plaintiff filed a Request for Review of the ALJ's decision, but that request was denied by the Appeals Council on March 6, 2004. (R. 7-9.) Thus, plaintiff has fully exhausted her administrative remedies, and the ALJ's decision of September 2, 2003, constitutes the SSA's final decision in this matter. See 42 U.S.C. § 405(g).

Plaintiff is now seeking judicial review of the SSA's decision on her application for social security benefits, pursuant to 42 U.S.C. § 405(g). Both parties have filed motions for summary judgment as prescribed by Local Rule 7.2(b), the issues have been fully briefed, and the matter is now ripe for decision.

## II.    THE RECORD

### A.    Plaintiff's Personal History and Work History

Plaintiff was born on July 16, 1964. She graduated from high school, and then went to a vocational school, where she studied phototronics for two years. She has never married, but she has two sons who live with her. The family lives in central Minnesota.

Plaintiff worked at a packaging job in the 1980s, and then worked as a waitress/bartender throughout most of the 1990s.  In 1999 and 2000, she worked as a photographer and reporter for a local newspaper.  (R. 106.)

**B.    Plaintiff's Medical History**

**1.    Sarcoidosis**

Plaintiff filed her disability claim shortly after being treated for Sarcoidosis,[1] which she developed in April and May of 2000.  A bronchoscopic biopsy was performed, and she was treated with Prednisone.  In November 2000, plaintiff was examined at the Mayo Clinic in Rochester, Minnesota.  (R. 377-85.)  At that time, Dr. David Midthun indicated that plaintiff's Sarcoidosis was "quiescent." (R. 378.) He reported that "[h]er pulmonary function testing now is normal," and he recommended that her use of Prednisone should be tapered "down or off."  (R. 380.)

**2.    Chronic Abdominal Pain**

Plaintiff has a long and complex history of abdominal ailments that have caused her to seek medical attention on innumerable occasions.  On those occasions, she has complained of severe stomach pain, bloating, diarrhea, nausea, and eating difficulties.  She has been diagnosed as having "dumping syndrome,"[2] and "nutcracker esophagus," (R.

---

[1]    Sarcoidosis is defined as "a systemic granulomatous disease of unknown cause, especially involving the lungs with resulting interstitial fibrosis." Stedman's Medical Dictionary, 27th Edition, (2000).

[2]    "Dumping Syndrome" is defined as "the syndrome that occurs after eating, most often seen in patients with shunts of the upper alimentary canal; characterized by flushing, sweating, dizziness, weakness, and vasomotor collapse resulting from rapid passage of large amounts of food into the small intestine." Stedman's Medical Dictionary, 27th Edition, (2000).

486).[3]  Plaintiff has had numerous procedures performed, including multiple endoscopies, at least one hiatal hernia operation, a Nissen fundoplication,[4] and a laparotomy to free a bowel obstruction, (R. 525).   The record shows that most of these procedures were performed during 2001 and 2002, although plaintiff had some earlier abdominal surgeries as well.  During the ALJ hearing, plaintiff testified that her gastrointestinal ailments had not dissipated, despite the numerous procedures that she has undergone.  (R. 913-16.)  She said, "I get really bad pains and it feels like there is something in there that's just squeezing and twisting in my stomach."  (R. 914.)

### 3.    Degenerative Disc Disease

Plaintiff also has a history of lower back pain, as well as neck pain.   As of December 4, 2001, an x-ray of plaintiff's spine revealed some degenerative disc disease. (R. 548.)  She has been treated for that condition by Dr. Panjini M. Sivanna.  (R. 567-69.) On March 13, 2002, Dr. Sivanna prescribed and administered an epidural steroid injection for Plaintiff's lower back, and a "trigger point injection" for her neck.   (R. 566, 568.) Dr. Sivanna examined plaintiff again on April 17, 2002, and reported that her "neck and shoulder pain ha[d] significantly improved."  (R. 566.)  At that time he gave her another epidural steroid injection, and prescribed Vicodin for her continuing pain.  (R. 566.)  In September 2002, plaintiff received another trigger point injection, this time from Dr. Roberto K. Ang.  (R. 776.)  In early October 2002, plaintiff's lower back pain (and headache pain), prompted her to seek emergency room treatment at the Tri County Hospital in Wadena,

---

[3]    The ALJ referred to plaintiff's condition as "reflux esophagitis," which he described, (based on plaintiff's explanation), by saying "the esophagus does not open and shut like it should."  (R. 17.)

[4]    A Nissen Fundoplication involves a complete "suture of the fundus [upper part] of the stomach... around the gastroesophageal junction to treat gastroesophageal reflux disease."  Stedman's Medical Dictionary, 27th Edition, (2000).

Minnesota.  (R. 832.)  On October 13, 2002, plaintiff was involved in a car accident that prompted her to return to the emergency room several more times for further treatment of her back pain.  (R. 828-31.)

In December 2002 and January 2003, plaintiff was examined and treated for her back pain by Dr. Sam M. Elghor.  (R. 843-59.)  Dr. Elghor prescribed a "diagnostic bilateral lower lumbar medial branch block," which was performed on December 18, 2002.  (R. 843, 845.)  That procedure had some positive effects, but further procedures, including a "radiofrequency bilateral lower lumbar facet joint denvervation," were contemplated.  (R. 843.)  The Court is unable to determine from the present medical records whether plaintiff actually received any further treatment from Dr. Elghor, but plaintiff claims she did have a "radio frequency denervation" in her back.  (R. 910.)  At the ALJ hearing in March 2003, plaintiff reported that the treatment provided by Dr. Elghor gave her "pretty good relief" for about a month, and then she "started to get some of the pain back again."  (R. 913.)

### 4.  Headaches

Plaintiff's medical records show that she has sought treatment for severe headaches on numerous occasions.  During the ALJ hearing, plaintiff testified that, on average, she suffers such headaches about three times per month.  (R. 911.)  When she has gone to the emergency room for treatment of her headaches, she has received Demerol, Toradol, Vistaril, and sometimes Morphine.  (R. 910.)

### 5.  Knee pain

Plaintiff has also received frequent treatment for knee pain.  A medical report dated December 16, 1999, indicates that she had arthroscopic surgery on her left knee on December 10, 1999.  (R. 294.)  The same report also indicates that as of that time,

(December 1999), plaintiff already had "a long history of pain and surgeries to her left knee." (R. 294.)

Most of the treatment for plaintiff's knees has been provided by Dr. Philip Johnson, an orthopaedic surgeon.   At the ALJ hearing in March 2003, Plaintiff testified that Dr. Johnson had operated on her knees several times – including the operation in December 1999.  (R. 907.)

The medical records show that between July and October of 2000, Dr. Johnson gave plaintiff multiple "Synvisc injection[s]" to the left knee.  (R. 559-62.)  In a report dated October 11, 2000, Dr. Johnson noted that plaintiff's left knee was "really kind of holding its own," but she had begun to experience problems with her right knee, which included "two episodes now where the knee has actually gone out on her and she has fallen." (R. 558.) Dr. Johnson recommended arthroscopic surgery for the right knee, and he performed that operation on October 31, 2000.  (R. 557.)

The record shows that plaintiff continued to have problems with her knees during 2001, and she frequently returned to Dr. Johnson for further care.  (R. 548-54.)  A report from December 2002 indicates that plaintiff's knee pain was exacerbated after her car accident in October of that year.  (R. 821.)  Dr. Johnson prescribed physical therapy for plaintiff's knees, which began again on December 19, 2002.  (R. 871.)

### 6.    Depression

As far as the Court can tell, plaintiff was never actually treated for any mental health problems until late in 2002.  However, several of plaintiff's earlier medical records indicate that she has had a history of depression.  For example, when Dr. Matthew Yelle examined plaintiff on March 26, 2001, regarding her complaints of abdominal pain and nausea, he noted that plaintiff has "a lot of mental health issues and anxiety."  (R. 515.)  In a report

dated April 6, 2001, Dr. Yelle noted that plaintiff had a "[h]istory of anxiety depressive disorder."  (R. 514.)  A report dated May 28, 2002, indicates that plaintiff had been taking anti-depressants, but it does not indicate who prescribed such medication.  (R. 721.)

It appears that the only comprehensive mental health examination plaintiff received was in December 2002 at the Northern Pines Mental Health Center.  (R. 814-19.)  Plaintiff was sent there by the Ottertail County Human Services Department, after one of her sons accidently shot and killed a man in a hunting accident.  (R. 814.)  Plaintiff was examined by Patti Venekamp, a licensed psychologist.  Venekamp's report confirms that plaintiff "ha[d] not been involved in mental health treatment for herself prior [to] this referral." (R. 816.)  Venekamp's report makes no reference to depression.  The report does say, however, that plaintiff's "cognitive ability appears impaired in the areas of sequential and detailed memory, applying learned material to daily life decision making process, lack of insight, judgment and reasoning skills impaired."  (R. 816.)  Venekamp also opined that plaintiff might be looking for ways to obtain prescription pain medications, (i.e., narcotics), and "financial compensation," (i.e., social security disability benefits).  (R. 817.)

### C.   Plaintiff's Testimony and Statements

The record also includes some information supplied by plaintiff herself, which sheds additional light on her abilities and limitations.  At the hearing before the ALJ, plaintiff testified that she was no longer able to work because of her depression, pain in her neck, back and knees, and chronic headaches.  (R. 896.)  Describing the pain in her knees she said that sometimes it reaches "a really bad point where I can hardly even walk or stand up."  (R. 896.)  Plaintiff also said that she has "deep vein thrombosis," which causes pain in her legs after she has been walking for about five minutes or more.  (R. 905-06.)  She testified that she can no longer do any gardening or other physical exercise because of the

pain in her neck, back and knees.  (R. 908-10.)

At the hearing, plaintiff described her normal daily activities as follows: She gets up around 6:30 a.m. to help her sons get ready for school.  After they get on the bus she goes back to bed and lays there until 11:00 to 11:30 a.m., and then she eats a light meal and watches television.  She seldom leaves her home.  When she goes grocery shopping, her sons come along to help her.  Her sons also help with preparing a simple evening meal. Plaintiff can drive, and she sometimes visits friends.  She also attends some of her sons' activities on occasion.  (R. 927-30.)

The record includes an "Activities of Daily Living Questionnaire" prepared by plaintiff and dated October 23, 2001, (R. 144-49), which provides some additional information about plaintiff's abilities and impairments.  In that report, plaintiff indicated that she does not care for herself as well as she did before she started developing her present health problems, (R. 144), she socializes much less than she did in the past, (R. 145), and she does not do as much art work as she has done in the past, (R. 148).  She also indicated that she no longer mows the lawn, rakes leaves, tends a garden, carries firewood, or goes for walks with her children.  (R. 148.)

### D.    Residual Functional Capacity Assessments

The record includes two primary written assessments of plaintiff's physical capacity. ("RFC").[5]  One RFC was prepared on October 18, 2002 by Dr. Philip Johnson, the orthopaedic surgeon who addressed plaintiff's problems with her knees.  (R. 810-13.)  The second RFC assessment was prepared by a consulting physician, Dr. William Paule, who

---

[5]    The record also includes a separate mental RFC assessment that was prepared by a consulting psychologist, Dr. Thomas Kuhlman, on February 11, 2002. (R. 529-46.)

did not personally examine plaintiff, but merely reviewed her medical records for SSA. (R. 570-78.) Dr. Paule's RFC assessment, dated November 3, 2001, (and briefly updated on November 25, 2001), was reviewed, and summarily "affirmed," by another consulting physician, Dr. Charles T. Grant, on May 22, 2002. (R. 577.) Two of plaintiff's other treating physicians, Drs. Yelle and Schmidt, also wrote letters to plaintiff's attorney in 2003 in which they indicated that while they had not seen plaintiff since 2001, they generally concurrred with Dr. Johnson's assessment of plaintiff's physical limitations. (R. 879-80; 881-82.)[6]

Dr. Johnson reported that the maximum weight that plaintiff could lift and carry was 20 pounds. (R. 810.) He also reported that her "[m]aximum ability to stand and walk (with normal breaks) during an 8-hour day" was "about 4 hours." (R. 810.) Dr. Johnson's RFC assessment further indicated that plaintiff could never do any twisting, stooping, crouching, kneeling or crawling, and that she could only "occasionally" climb stairs or ladders, flex or rotate her neck, or operate repetitive foot controls. (R. 811, 813.)

Dr. Paule reported that plaintiff could occasionally lift and carry up to 50 pounds, and that she could frequently lift and carry up to 25 pounds. (R. 571.) He also reported that plaintiff could "[s]tand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour work day." (R. 571.)   According to Dr. Paule, there are no physical limitations on plaintiff's ability to climb, balance, stoop, kneel, crouch or crawl. (R. 572.)

---

[6]      It appears from the records that Drs. Yella and Schmidt saw plaintiff for abdominal pain, tension headaches, reflux esophagitis, chronic pain, anxiety disorder and depression. (R. 505-09, 514-17,879.)

## III.    ALJ's ANALYSIS

### A.    The Five-Step Analysis Prescribed by the Regulations

To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, which requires the ALJ to make a series of factual findings regarding the claimant's work history, impairment, RFC, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920;  see also   Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Eighth Circuit described this five-step process in Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994) as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment.  If so, the claimant is not disabled.  If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.  If not, the claimant is not disabled.  If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled.  The fourth step asks if the claimant's impairments prevent her from doing past relevant work.  If the claimant can perform past relevant work, she is not disabled.  The fifth step involves the question of whether the claimant's impairments prevent her from doing other work.  If so, the claimant is disabled.[7]

### B.    The ALJ's Application of the Five-Step Analysis in This Case

In this case, the ALJ followed the five-step analysis prescribed by the regulations. At step one of the analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity at any time relevant to her application for Social Security benefits.  (R. 19,

---

[7]    Defendant has pointed out that the SSA regulations were "revised and reorganized" shortly after the ALJ issued his decision in this case, but these changes "do not reflect a substantive change in the sequential evaluation process."  (Defendant's Memorandum In Support Of Motion For Summary Judgment, [Docket No. 21], p. 9, n. 3.) Defendant suggests that it is best, for present purposes, to "cite the regulations that were in effect at the time of the ALJ's decision."  The Court agrees with that suggestion, and has followed it here.

31.)  At step two, the ALJ found that plaintiff's "degenerative disease of the lumbosacral spine and history of knee repairs" must be viewed as a "severe impairment" for purposes of the five-step analysis.  (R. 19, 31.)  At the third step of the analysis, the ALJ determined that Plaintiff's impairments do not meet or medically equal any listed impairment.[8]  (R. 19, 31.)

At the fourth step of the sequential evaluation process, the ALJ assessed plaintiff's RFC, and whether, in light of her RFC, she could still perform any of her past relevant work. The ALJ concluded that plaintiff's RFC would permit her to "perform the full range of light work," (R. 30), which the regulations describe as follows:

> "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

20 C.F.R. § 404.1567(b).

Based on a report filed by the VE, (R. 161), the ALJ found that plaintiff's past work as a bartender was rated as "light work" for purposes of determining disability under the Social Security regulations.  (R. 30.)  The ALJ therefore determined, at step four of the sequential evaluation process, that plaintiff's impairments do not prevent her from performing her past relevant work as a bartender.  (R. 31.)  Based on that determination,

---

[8]     The "Listed Impairments" that are to be considered at step three of the evaluation process are set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.

the ALJ concluded that plaintiff is not disabled for Social Security purposes, and that she is therefore not eligible for Social Security benefits.

## STANDARD OF REVIEW

Judicial review of an ALJ's decision is limited by federal law.  Federal courts may review an ALJ's decision to determine whether it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g);  Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000);  Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996);  Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012  (8th Cir. 2000).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938));  see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).   "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'"  Buckner, 213 F.3d at 1012, (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000));  see also Cox v. Apfel,160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings. . .'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis. . .'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951));  see also Cline v. Sullivan, 939 F.2d 560, 564 (8th Cir. 1991) (same);  Cox, 160 F.3d at 1206-07 (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  Culbertson, 30 F.3d at 939.  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

When a claimant appeals from the Commissioner's denial of benefits and a finding is made that such a denial was improper, out of an abundance of deference to the ALJ, generally the case is remanded for further administrative proceedings.  Consistent with this rule, this Court may enter an immediate finding of disability only if the record overwhelmingly supports such a finding.  See Buckner, 213 F.3d at 1011 (quoting Cox, 160 F.3d at 1210; Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)); Cline, 939 F.2d at 569 (finding an immediate order granting benefits is appropriate where "the total record convincingly establishes disability and further hearings would merely delay receipt of benefits").

**ISSUES PRESENTED**

In this case, plaintiff claims that the ALJ committed two basic errors during the course of the five-step disability evaluation process.  First, she contends that the ALJ wrongly rejected the opinions of her treating physicians, most notably Dr. Johnson. Second, she contends that the ALJ wrongly discounted her subjective description of her impairments – especially her subjective complaints of headache pain and breathing difficulties.  Plaintiff claims that as a result of these errors, the ALJ improperly concluded that she could still perform the "full range of light work," and that she was still able to perform her past relevant work as a bartender.

The Court agrees with plaintiff that the ALJ's RFC assessment – i.e., that plaintiff can still perform the full range of light work – is not sustainable.  However, the Court finds, for reasons discussed below, that the fundamental problem with the ALJ's decision is that he simply did not have sufficient medical evidence to make a well-informed decision about plaintiff's RFC.  Therefore, the Court concludes that this case must be remanded for further development of the medical record.[9]

**DISCUSSION**

**I.    THE ALJ'S DUTY TO DEVELOP THE RECORD**

It is "well-settled" that "'it is the ALJ's duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel.'"  Delrosa v. Sullivan, 922 F.2d 480, 485, n. 5 (8th Cir. 1991), quoting Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)).

---

[9]      Plaintiff's arguments pertaining to the assessment of her treating physicians' opinions and her subjective complaints will not be specifically addressed here, because the ALJ will undoubtedly have to reconsider those matters in light of the more complete medical record to be developed on remand.

The duty to develop a claimant's medical record is established by the SSA Regulations, which provide that:

> "When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.  To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available....
>
> If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense...."

20 C.F.R. § 416.912(e) and (f).

As the Regulations indicate, "[w]hen a claimant's medical records do not supply enough information to make an informed decision, the ALJ may fulfill this duty [to develop the medical record] by ordering a consultative examination."  Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992).  "Moreover, '[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'"  Id., quoting Dozier, 754 F.2d at 276, (emphasis added).

The duty to fully develop the record is not satisfied by merely having the claimant's medical records reviewed by a medical consultant.  There must be adequate relevant medical evidence generated by a medical expert who has actually examined the claimant, and not just the claimant's records.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). If the medical experts who have examined the claimant have not provided sufficient information to make a well-informed assessment of the claimant's impairments and RFC, then the ALJ must make suitable arrangements to obtain such information before deciding whether the claimant is disabled.  Id.

II.    **THE ADEQUACY OF PLAINTIFF'S MEDICAL RECORDS IN THIS CASE**

In the present case, the Court finds that plaintiff's medical records do not provide enough information to properly assess her physical impairments and her resulting RFC. The ALJ specifically recognized that plaintiff's "degenerative disease of the lumbrosacral spine and history of knee repairs result in more than minimal limitations upon [her] ability to perform basic work activity" and found that these conditions amounted to severe impairments. (R. 19.) Having made that threshold determination, the ALJ next needed to determine the extent to which those impairments actually limited plaintiff's RFC and her ability to work.   However, the present record does not contain adequate information concerning plaintiff's impairment-related limitations to make a reliable assessment of her RFC.

Despite the relatively large overall volume of the medical records in this case, there is very little evidence that sheds any meaningful light on plaintiff's RFC.  The only evidence from a treating physician that directly addresses the RFC issue is Dr. Johnson's report of October 18, 2002.  (R. 810-13.)  However, given that Dr. Johnson treated plaintiff only for her knee problems, his report sheds no light on the limitations resulting from plaintiff's degenerative disc disease or other impairments, which the ALJ determined were not severe.  The physicians who treated plaintiff's degenerative disc disease were Drs. Sivanna and Elghor.  Neither of those doctors has ever expressed an opinion about the severity of plaintiff's back and neck impairments, or the extent to which those impairments may limit her ability to work.  Indeed, aside from Dr. Johnson's limited assessment of plaintiff's knee-related limitations, there is virtually no medical evidence that

provides any useful information about how plaintiff's impairments might limit her RFC.[10]

### A.    ALJ Made RFC Assessment Without Sufficient Evidence

Even though plaintiff's treating physicians provided very little information about her specific physical limitations, the ALJ was not deterred from reaching his own conclusion about her RFC.  The ALJ expressly determined that plaintiff "retains the residual functional capacity to perform a full range of light work."  (R. 30.)  This means that the ALJ found plaintiff could perform not only the weight lifting requirements of light work (lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds), but that she could also satisfy the standing and walking requirements of light work.  To meet those latter requirements, plaintiff must be able to stand or walk for up to six hours during an eight-hour workday.  Social Security Ruling 83-10.  See also Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) ("'[l]ight work' requires that a claimant be capable of standing or walking for a total of six hours out of an eight-hour work day"); Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001) (same); Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990) (same).

The Court finds that this aspect of the ALJ's RFC determination – i.e., that plaintiff can stand or walk for six hours during an eight-hour workday – is not supported by the current record.  The only existing evidence that supports the ALJ's finding that plaintiff can stand or walk for six hours during an eight-hour work day is the consultative report prepared by Dr. Paule.  (R. 570-78.)  That report by itself, however, does not provide substantial evidence in support of the ALJ's RFC determination, because Dr. Paule never examined

---

[10]    The reports from plaintiff's other treating physicians, Drs. Yelle and Schmidt, are of little help, as they declined to offer any specific independent opinions regarding plaintiff's RFC, but merely deferred to Dr. Johnson's report.

plaintiff.  See Nevland, 204 F.3d at 858 ("[t]he opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence").

Dr. Paule's assessment is inadequate, not only because he never personally examined plaintiff, but also because he did not even examine all of the relevant medical records.  When Dr. Paule prepared his RFC assessment form in November 2001, he obviously did not have the benefit of seeing any of the relevant medical information generated after that date.[11]  Most notably, Dr. Paule did not have an opportunity to review Dr. Johnson's report from October 2002 – a deprivation that clearly diminishes the value of Dr. Paule's report.  See Frankl, 47 F.3d at 938 (RFC forms prepared by a consulting, non-examining, physician "cannot constitute substantial evidence that [claimant] was capable of performing the full range of light work ... because the opinions in these agency RFC assessment forms... were not based upon the full record in this case").

The Court also finds it particularly significant that Dr. Paule did not consider how plaintiff's RFC is effected by her degenerative disc disease – one of the two "severe impairments" identified by the ALJ.  Dr. Sivanna and Dr. Elghor did not treat plaintiff for her back problems until 2002, which was after Dr. Paule submitted his physical RFC assessment.  Therefore, Dr. Paule obviously had not reviewed Dr. Sivanna's and Dr. Elghor's reports when he prepared his physical RFC assessment.[12]

---

[11]     It is interesting to note that the ALJ discounted the reports of two of plaintiff's treating physicians, Drs. Yelle and Schmidt, because they purportedly had not seen plaintiff since 2001. (R. 25)  Yet the ALJ expressed no reservations about accepting Dr. Paule's RFC assessment that was based solely on plaintiff's medical records from 2001 and before.

[12]     The Court recognizes that Dr. Grant's three-sentence "update" of Dr. Paule's assessment, (R. 577), is dated May 22, 2002, which was shortly after Dr. Sivanna's initial report.  Dr. Grant's brief notation, however, does not cure the insufficiency of Dr. Paule's assessment, because there is nothing to indicate that Dr. Grant actually saw Dr. Sivanna's first report.  Furthermore, given the date of Dr. Grant's notation, we know that he certainly did not see Dr. Sivanna's later reports, or any of Dr. Elghor's records.

Furthermore, Dr. Paule's opinion regarding plaintiff's ability to stand and walk is directly contradicted by her treating physician, Dr. Johnson.  According to Dr. Johnson's report of October 18, 2002, plaintiff's maximum capacity to stand and walk is limited to about <u>four hours</u> during an eight-hour day.[13]  (R. 810.)  The ALJ certainly did not have to accept all of Dr. Johnson's report at face value, but he could not reject the opinion of a treating physician on a critical RFC issue, (namely the capacity to stand and walk), and base his RFC assessment <u>solely</u> on the contrary opinion of a non-examining physician.  <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999) ("There is no other evidence in the record to support the ALJ's residual-functional-capacity finding besides the non-treating physician's assessment.  This assessment alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician.")

The opinions of a non-examining medical consultant are certainly entitled to some weight, especially when they are corroborated by other evidence of record.  In this case, however, there is no other evidence of record, besides the opinion of non-examining physician Dr. Paule, which supports the ALJ's determination that plaintiff can perform the standing or walking required by the full range of light work.  Defendant has failed to explain how Dr. Paule determined – with no physical examination, and only limited medical information – that plaintiff can occasionally lift 50 pounds, she can frequently lift 20 pounds, she can walk or stand for up to six hours during an eight-hour work day, and she can climb, balance, stoop, kneel, crouch and crawl without limitation.  (R. 571-72.)  Indeed, the ALJ himself expressed doubts about the reliability of Dr. Paule's assessment, noting that he

---

[13]     In light of the treating physician's clearly stated opinion that plaintiff is limited to about four hours per day of standing or walking, the Court cannot understand why the ALJ found <u>"no evidence"</u> that she is unable to perform the six hours per day of standing or walking involved in light work.  (R. 30.)

"cannot establish with certainty that this assessment has considered the knee surgeries and/or back impairment."  (R. 25.)

In sum, the Court finds that aside from Dr. Paule's report, there is no other medical evidence to support the ALJ's determination that plaintiff can stand or walk for six hours during an eight-hour workday, and that she can therefore perform "the full range of light work."  Dr. Paule's physical RFC assessment does not satisfy the "substantial evidence" standard because (a) it is not based on any personal examination of plaintiff herself, (b) it is based on incomplete medical information, and (c) it is directly at odds with the medical report provided by plaintiff's treating physician.   Thus, the Court concludes that the ALJ's assessment of plaintiff's RFC is not supported by substantial evidence.

### B.    Remand Is Required

The ALJ's determination that plaintiff can still perform her past work as a bartender was predicated on his RFC determination, namely that she can still perform the full range of light work.  Because the ALJ's RFC determination is not supported by the record, it follows that his concomitant determination (at step four of the sequential evaluation) that plaintiff can still perform her past relevant employment is likewise not sustainable.  That means, of course, that the ALJ's ultimate determination that plaintiff is not disabled is also not supported by the record as a whole.

If the ALJ did not believe that Dr. Johnson's report provided an accurate, current and reliable basis for determining plaintiff's RFC, (which is essentially what the ALJ said), then he should not have simply rejected Dr. Johnson's report and adopted the findings of a non-examining physician.  Instead, the ALJ should have taken the actions prescribed at § 416.912(e) and (f) of the Regulations, in order to develop the record more fully.  In other words, the ALJ should have gone back to Drs. Johnson, Sivanna, and Elghor, (and perhaps

Drs. Yelle and Schmidt as well), and asked for a more complete explanation of plaintiff's exertional and non-exertional limitations, in accordance with § 416.912(e). Alternatively, the ALJ should have sent plaintiff to another doctor for a complete consultative examination, in accordance with § 416.912(f). See Nevland, 204 F.3d at 858; Bishop, 900 F.2d at 1263. Because the ALJ did not take either of those actions, he did not fulfill his duty to fully develop the record in this case.

The Court will therefore recommend that the ALJ's decision in this case be vacated, and that the case be remanded for further administrative proceedings and further development of the medical record. On remand, the ALJ should take appropriate steps to ensure that the record includes sufficient medical information to accurately assess the true nature and extent of all of plaintiff's exertional and non-exertional limitations.

As previously noted, the Court will not presently reach plaintiff's claims that the ALJ wrongly rejected the opinions of her treating physicians, and wrongly rejected her own subjective complaints of pain. Because the record needs to be further developed, it would serve no useful purpose to discuss those two matters here. As of now, the Court could address only whether the treating physicians' opinions and plaintiff's subjective complaints of pain could properly be rejected on the basis of the present record. Considering whether the present record supports the ALJ's past conclusions on those matters would be merely an academic exercise.

## CONCLUSION

For the reasons discussed above, the Court concludes that the ALJ's final decision in this case, denying plaintiff's application for Social Security benefits, cannot be upheld. The existing medical record is incomplete, because it does not include sufficient information about plaintiff's exertional and non-exertional limitations. In particular, there is

not enough medical information from doctors who have treated plaintiff, (or have at least examined her), to make a meaningful assessment of how plaintiff's knee, back and neck impairments, combined with her chronic abdominal ailments and other impairments, limit her ability to stand and walk, lift and carry, and otherwise move her body, (i.e., bending, stooping, climbing, reaching, pushing and pulling). This case must be remanded, so the ALJ can fulfill his responsibility to fully develop the record in the manner prescribed by the SSA Regulations and Eighth Circuit case law.

Therefore, this Court recommends that plaintiff's motion for summary judgment be granted in part and denied in part. Plaintiff's request for an order vacating the ALJ's decision should be granted, but her request for an immediate award of benefits should be denied. It will also be recommended that defendant's motion for summary judgment be denied, and that this case be remanded for further administrative proceedings. On remand, the ALJ will have to solicit further medical information from plaintiff's treating physicians, from some other expert medical consultant who has actually examined plaintiff, or both. The ALJ will have to make sure there is sufficient medical evidence, provided by medical experts who have actually examined plaintiff, to make an accurate assessment of her RFC.

If the ALJ still believes, after considering the new, fully-developed, medical record, that the treating physicians' opinions and plaintiff's subjective complaints of pain should be discounted, he will have to explain his position on those matters in light of the new record.

Finally, the ALJ also will have to reconsider his final RFC determination in light of the new medical record. If the ALJ revises his final RFC determination, he will then have to solicit new testimony from a Vocational Expert in order to determine whether plaintiff can still perform her past relevant work, or whether, at step-five of the evaluation process, there are any other jobs that plaintiff could perform given the ALJ's post-remand RFC

determination.  See Jenkins, 196 F.3d at 925 (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion); Nevland, 204 F.3d at 858 (same).

## **RECOMMENDATION**

Based on the foregoing, and all the files, records and proceedings herein,

IT IS HEREBY RECOMMENDED that:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 13] be granted in part and denied in part;

2.      Defendant's Motion for Summary Judgment [Docket No. 20] be denied; and

3.      The decision of the ALJ be reversed and the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.


Dated:      August 3, 2005


                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge



Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before August 22, 2005 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.